St. Louis-San Francisco Railway Company, Kurn, Trustee, *v.* Gilstrap, Administrator.

4-7145                      174 S. W. 2d 941

Opinion delivered November 8, 1943.

*E. G. Nahler* and *Warner & Warner,* for appellant.

*Howell & Howell,* for appellee.

SMITH, J. ·This suit arose out of the alleged negligent killing of the appellee's intestate by the operation of one of appellants' trains. For the reversal of the judgment for the sum of $2,250, from which is this appeal, many errors are assigned; but we find it necessary to consider only one of them—the sufficiency of the testimony to support the verdict.

The background of the suit is to the following effect: The deceased was addicted to drink. The last person to have a conversation with him, so far as the record shows, was a Mrs. Smith, who sold the deceased some link sausage. Asked what deceased's condition was at that time, Mrs. Smith answered, "I just waited on him and did not pay close attention to him." She said this sale occurred "near dark."

From this store deceased had walked, presumably on the railroad track, a distance of one and one-fourth miles to the place where his dead body was found. The mutilation of the body indicated he had been killed by a train, and the testimony shows he was killed by a southbound freight train, consisting of twenty cars and deadhead engine.

The last persons to see the deceased, when he was alive, were four boys, on their way to church, whose ages ranged from twelve to nineteen years. One of these boys, named Neeley, whose testimony is substantially the same as that of the other boys, testified that he saw the deceased, who was walking down the railroad track staggering. Deceased dropped his package of sausages, and one of the boys testified deceased was down on his knees picking them up. Another boy testified that deceased sat on the rail of the track picking up his sausages.

One of the boys, whose own father, like deceased, was addicted to drink, thought deceased was his father, and went close up to the man to see who the man was. The boy spoke to the man, who mumbled an incoherent answer, and all of the boys smelled whiskey, and the

neck of a whiskey bottle was found near the deceased's body.

One of the boys testified that when last seen deceased was sitting on the west rail of the track, with his head down on his knees. Evidently deceased had proceeded about as far on his way home as his condition would permit. The testimony is not definite as to the time which elapsed before deceased was struck by the train, after the boys passed him, but the time was approximately twenty minutes.

The operatives of the train testified that a constant lookout was kept, but that they did not see deceased, and did not know they had run over him. The testimony does not show deceased's position at the time he was run over, but the most probable answer to this question is that he had fallen into a drunken slumber. Certainly no one testified that he was standing on the track when he was struck, and it is so highly improbable that it is almost incredible that deceased arose to a standing position and remained in that position until he was struck by the train. The nearest railway crossing was more than three hundred yards from the scene of the accident, and there is no denial of the testimony that appropriate signals were given as the train approached the crossing.

It is conceded that the deceased was a trespasser and his negligence was of the grossest kind. This is conceded, but the verdict is defended upon the ground that, had a proper lookout been kept, the deceased's presence and peril would have been discovered in time to stop the train before striking him. The only testimony lending any support to this theory is that of certain persons who went to the scene of the accident to ascertain at what distance a man on the track could have been seen from an approaching engine. But there was lacking in the testimony the identity of conditions as they appeared to the engineer, and this testimony has but little probative value, if, indeed, it was competent at all. It could make no difference how far a man standing on the track could be seen, if deceased was not standing on the track. It is undisputed that just before striking deceased the train came

around a one-degree curve, and it requires no testimony to know that the light beams from the headlight extended directly ahead, and it is undisputed that the train, as it rounded the curve, entered a cut through the earth, several feet deep, on the bank of which vegetation was growing. The train which struck deceased was traveling south from Monett to Van Buren, and it began to rain just before the train reached Van Buren, a mile and a half, or such matter, from the scene of the accident, and before the train passed Van Buren it was raining hard.

Under these circumstances, it appears arbitrary to disregard the testimony of the engineer (whose position for keeping the lookout was more favorable than that of the fireman, on account of the curve in the track) that he did keep a constant lookout, and that he did not discover deceased's presence and could not have stopped the train had he seen him. It is obvious, we think, that a case was not made for submission to the jury unless the provisions of the lookout statute, § 11144, Pope's Digest, made it so. Many cases have construed and applied this statute, in some of which it was held that the provisions of this act made a case for the jury, but in others not.

One of the most recent of these cases is that of *Missouri Pacific Ry. Co.* v. *Severe,* 202 Ark. 277, 150 S. W. 2d 42. We there considered the conditions under which the provisions of the lookout statute could be availed of and be said to make a case for the jury. We there quoted, and again approved, as numerous other cases had done, the construction given this statute in the first case which considered the act, the case of *St. Louis, I. M. & S. Ry. Co.* v. *Gibson,* 107 Ark. 431, 155 S. W. 510. We there said: "But in the construction of our Lookout Statute in the first opinion, it was said that 'It was not intended, however, that upon proof of the killing of a trespasser by the operation of a train that the presumption should arise that the killing was negligent and the plaintiff entitled to recover damages without showing anything further, and casting the burden of proof upon the company to show that it was not guilty of any negligence, causing the death, as declared in said instruction numbered 1.' "

In this Severe case we also quoted from the opinion upon the second appeal of the Gibson case an instruction reading as follows: " 'And the burden is upon the plaintiff to prove by the testimony, facts sufficient to raise a reasonable inference that the danger might have been discovered and the injury prevented by the trainmen, if a lookout had been kept. And, if the plaintiff has proved such facts sufficient to raise such inference, your verdict should still be for the defendant, if you find from a preponderance of the testimony that a constant lookout was kept by the enginemen, and that they used ordinary care to prevent the injury after actually discovering that deceased was in peril.' "

Now, the circumstances attending the finding of a mutilated body upon a railroad track might be such as to support the inference that the deceased person had been killed by the operation of a train, even in the absence of direct testimony to that effect, but this showing alone would not make the provisions of the lookout statute applicable. "It must be further shown (as was said in the Severe case, *supra*,) by testimony sufficient to raise a reasonable inference, that the danger might have been discovered and the injury averted by the trainmen, if a proper lookout had been kept." Here, the testimony sustains the finding that the deceased was killed by the operation of a train, but it does not show that the accident could have been averted had a lookout been kept.

The judgment must, therefore, be reversed, and as the cause appears to have been fully developed, it will be dismissed.